# IN THE COURT OF APPEALS OF IOWA

No. 19-1999
Filed June 3, 2020

**IN THE INTEREST OF N.J., N.W., and N.J.,**
**Minor Children,**

**D.J., Father,**
        Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Lynn Poschner, District

Associate Judge.


        A father appeals the juvenile court order terminating his parental rights to

three children under Iowa Code chapter 232.  **REVERSED AND REMANDED.**


        Blake D. Lubinus of Lubinus & Merrill, P.L.C., Des Moines, for appellant

father.

        Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant

Attorney General, for appellee State.

        Chira L. Corwin of Corwin Law Firm, Des Moines, attorney and guardian ad

litem for minor children.


        Considered by Doyle, P.J., and Mullins and Greer, JJ.

**GREER, Judge.**

A father appeals the juvenile court permanency order directing the State to proceed with termination of his parental rights to three minor children as well as the order terminating his rights under Iowa Code chapter 232 (2019).[1] On appeal, the father argues the juvenile court should have granted him six more months to regain custody of the children rather than directing the State to initiate termination proceedings, the State failed to prove grounds for termination, termination is not in the children's best interests, and an exception should be applied to prevent termination. We conclude the father should have been given an additional six months to pursue reunification. For that reason, we reverse and remand this case for further proceedings.

## I. Background Facts and Proceedings.

D.J. is the father of N.J., born in December 2011; N.W., born in January 2014; and Na.J., born in February 2016. These children lived with their mother until an incident in June 2017, when she left them home alone for several hours. The Iowa Department of Human Services (DHS) removed the children from her care and placed them with the father. The children were adjudicated in need of assistance in August for "ongoing issues of lack of proper supervision, domestic abuse between the parents, and poor parental decision making."

The father and mother have a history of domestic violence, with both serving as the perpetrator and the victim. There was a no-contact order in place between the parents throughout this case. The latest incident occurred in February 2018,

---

[1] The mother did not participate in the termination hearing and does not appeal the termination of her rights to these children.

when the mother showed up at the father's home unannounced, pushed her way into the home, and punched and scratched him. The father called the police, and the mother fled the scene. She was later arrested and charged with assaulting the father.

Also in February, a DHS caseworker tried to meet with the father at his home. The worker did not make contact with the father but did smell the odor of marijuana. The worker later spoke with one child who reported that her father smokes cigarettes and "black stuff," and said that the black stuff "smells different." The father denied using drugs and failed to submit to a drug test. DHS recommended the father engage in mental-health and substance-abuse services, participate in random drug screens, and follow through with any recommendations. DHS also recommended the father participate in a Caring Dads program.

On March 9, DHS removed the children from the father as a result of the February domestic incident and the father's failure to participate in drug testing. On March 20, the father obtained a mental-health evaluation that reported no diagnosable mental-health conditions and did not recommend any mental-health services. The father provided negative drug screens on April 6, 10, and 24,[2] and May 8 and 11. The children were returned to the father on May 23. He failed to show up for drug testing on May 29, and June 12 and 29.

The father completed the Iowa Domestic Abuse Program (IDAP) on July 12. There have been no domestic violence incidents involving the father since the February incident in which he was the victim.

---

[2] The father missed an April 14 drug test.

A September DHS report to the court noted that the father was currently living with a friend who did not want DHS in the home. The DHS worker tried to reach the father at the home but could not contact anyone. The DHS worker smelled the odor of marijuana outside the home. It was unclear whether the father or children were present at the time. However, on September 19, the family safety, risk, and permanency (FSRP) worker and DHS worker dropped the children off at the home after a visit with their mother. The father showed the workers where the girls slept and the FSRP worker noted the home smelled of marijuana. She asked the father to provide a drug sample by the end of the week but did not refuse to leave the children in the father's care.

On October 11, the father's drug test came back positive for cocaine. The children were removed from his custody on October 24. At that time, one of the children had a scalp infection that did not appear to have been treated with the recommended medication. The foster parents applied the medication as recommended, and the infection cleared up. The children have not been returned to the father's custody since the October removal.

A March 2019 case plan recommended that the father meaningfully engage in therapy, provide random drug screens at DHS's request, complete a substance-abuse evaluation and comply with any recommendations, and cooperate with the FSRP services. On March 1, the father tested positive for THC. DHS agreed with the father that if his drug screens showed lower THC levels over two to three weeks, it would look into semi-supervised visits and a possible extended visit during the foster parents' June vacation. In May, the father agreed to be on a regular drug testing program but only completed one urinalysis (UA) on May 24,

which came back positive for marijuana.  The father no-showed for testing on June 11.

The court held a permanency hearing on September 4 and 11.  The State recommended initiating termination proceedings.  The father resisted, asking either for the children to be returned to him or for a six-month extension.  The father called the DHS worker and FSRP worker as witnesses and testified on his own behalf.  The father acknowledged he last used marijuana a few weeks before and that he did not follow the drug-testing plan, claiming he was tired of taking drug tests and had trouble getting transportation.  Shortly after this hearing, the father had a sweat patch applied, but he never showed up to have it removed.  He later said it fell off and that no one instructed him how long to wear it.

The State filed a petition for termination of parental rights on October 1.  The court held a hearing on October 28.  At the termination hearing, the father acknowledged his last use of marijuana was on October 15, after his cousin died.  During times of stress, the father used marijuana to calm his nerves, and he thought mental-health treatment was "pseudoscience."  He maintained he did not use cocaine when he tested positive in October 2018.  He testified that while parenting, he never used drugs around his children.  He did not believe he needed drug treatment.  And the father points to the excellent reports of the FSRP worker detailing his positive parental skills.  Also at the time of the hearing, the father testified that he had just gotten the keys to a two-bedroom home and he planned to move in on November 1.

After the hearing, the juvenile court terminated the father's rights to the older two children under Iowa Code section 232.116(1)(f) and to the youngest child

6

under section 232.116(1)(h). The court found termination was in the children's best interests and noted that no permissive exception applied to prevent termination. The court noted that the father had good parenting skills and loved his children. Still, the court found that the father had failed to address his substance abuse and that he "exposed the children to the use of marijuana (through his own use and the use of others around him)." The court noted the father "refuse[d] or miss[ed] additional drug screens and ignore[d] the problem." The juvenile court summarized the father's actions throughout the case as follows,

> [The father] has not shown a sustained commitment and ability to provide the children with a safe place to live—free of drug usage— nor has he addressed his substance use or shown abstinence from substances. [The father] has refused drug screens throughout the case and has also tested positive for marijuana, and on at least one occasion, cocaine. He has not attended drug treatment.

The father appeals the termination of his parental rights to his three children.

## II. Standard of Review.

We review termination of parental rights orders de novo. *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014). We give weight to, but are not bound by, the juvenile court factual findings, especially on witness credibility. *In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012). Our paramount concern is the best interests of the children. *In re A.S.*, 743 N.W.2d 865, 867 (Iowa Ct. App. 2007).

## III. Analysis.

The father raises many arguments on appeal. He first challenges the juvenile court's permanency order directing the State to proceed with termination instead of returning the children to his custody or granting him a six-month extension. The permanency order is interlocutory, and the termination order is the

final order disposing of all issues in the case. *See In re T.R.*, 705 N.W.2d 6, 11 (Iowa 2005). "[T]he provisions of the permanency order 'will inure or be subsumed in the termination order in the termination proceeding.'" *In re S.P.*, No. 18-0432, 2018 WL 3913675, at *1 (Iowa Ct. App. Aug. 15, 2018) (quoting *T.R.*, 705 N.W.2d at 11). For that reason, we will address only the termination order. At termination, the father again asked for the children to be returned to his care or, alternatively, for an extension of time. We find the extension-of-time issue dispositive.

"Under section 232.117(5), the juvenile court may order an extension of time under section 232.104 as an alternative to terminating parental rights." *In re A.D.*, No. 19-1418, 2019 WL 5792709, at *2 (Iowa Ct. App. Nov. 6, 2019). The court may grant this extension "based on a 'determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period.'" *Id.* (quoting Iowa Code § 232.104(2)(b)). "Under some circumstances extensions could be appropriate. 'The judge considering them should however constantly bear in mind that, if the plan fails, all extended time must be subtracted from an already shortened life for the children in a better home.'" *In re A.A.G.*, 708 N.W.2d 85, 92 (Iowa 2005) (citation omitted).

We agree with the father that the juvenile court should have granted him a six-month extension of time. We begin by addressing the father's greatest strengths: his love for his children and his parenting skills. By all accounts, this father has a strong, loving bond with his children and always appropriately cared for the children during his visits with them. The court described his interactions with the children as follows,

[The father's] interactions with the children go very well. He is attentive, affectionate and engaged. He has not appeared to be under the influence of substances during his supervised interactions with the children. He is prepared for the visits with snacks for the children. He works with the children on schoolwork and is firm but not aggressive.

Important in our review, the notes about the father's visits glowed with comments about his abilities with the children.[3] Yet we acknowledge the father did not progress beyond supervised visits and did not have any trial home visits after the children were removed from his care in October 2018. This record is unclear if any lack of progress related to his living situation, the turnover of the seven DHS caseworkers involved with the case, or other factors. What is clear is his commitment to consistently attend visits. By all accounts, the father is engaged, loving, and provides appropriate discipline when necessary.

As an additional strength, the father maintained employment throughout this case. And, while the father struggled with housing instability, he had a safe place to live with friends at the time of the permanency hearing. When DHS asked to enter the home he was staying in, the father said that he was concerned because "it wasn't his home, and it wasn't just his life that I would be going in and observing." At the time of the permanency hearing, however, DHS had approved the house for visits. That said, the father still generally preferred having visits in the community. At the time of the termination hearing, he had gotten his own place and was getting ready to move in. There was no indication this housing was inadequate.

---

[3] Among other positive comments, the notes described that the father used appropriate discipline, addressed issues of hygiene he found lacking, brought clothes and food to visits and, overall, was connected at a high level of attachment with the children.

As the case progressed, the identified issues were domestic violence between the mother and father, possible mental-health issues, and the father's substance abuse. Although the father did not participate in therapy as DHS recommended, he did obtain a mental-health evaluation in March 2018 that made no diagnoses and did not recommend any services. Addressing the domestic-violence concerns, the father completed IDAP in July 2018. And, although the father did not participate in therapy, there were no other incidents of domestic violence involving the father after the February 2018 incident in which he was the victim. Thus, by the time of the termination hearing, the substance-abuse issue took center stage.

Even though it was not the initial reason for removal, the father's use of illegal substances has been the main focus throughout the case. He did test positive for cocaine use. Yet, while the father acknowledged his marijuana use, he vehemently denied ever using cocaine. He never tested positive for cocaine after the initial positive test in October 2018. But the father inconsistently participated in substance-abuse testing, and it is unclear whether he ever underwent a substance-abuse evaluation.[4] While there were five negative tests after the test positive for cocaine, two later drug tests reflected marijuana use. It is unclear how often he used. The father admitted to using marijuana a few weeks before the termination hearing after his cousin died. He also acknowledged he had a sweat patch applied but had not gotten it removed, noting he was unsure of how long he needed to wear the patch. He also acknowledged he had been

---

[4] In each FSRP update, it was reported that the father had "completed a *substance abuse evaluation* that recommended no treatment." (Emphasis added).

requested to submit to a UA but testified he only had a few bus tokens so he did not go submit to that testing.

We do not condone the father's drug usage or his failure to participate in drug testing. But there are several barriers to access of services here that are hard to ignore. As noted, the father testified that he was unaware of the sweat-patch testing procedures. And throughout the case the father struggled with having reliable transportation and a reliable means of communication. He relied on others and public transportation to get around. He was often hard to reach by cell phone. He was given bus tokens but testified he did not have enough to travel to the drug testing facility multiple times.

We also find important that from May 2017 until October 2019, seven DHS caseworkers had cycled through this case, some only working on the case for a few months.[5] Importantly, between the time of the cocaine test and the termination hearing, the father dealt with three different DHS caseworkers. The father's counsel opined that this turnover led to issues with drug testing because the DHS workers had to authorize the tests. As of the September permanency hearing, the last authorized drug screen was June 11. And no caseworker requested testing between June and the permanency hearing. While the current DHS caseworker had authorized a pending drug screen at the permanency hearing, it was unclear if she had asked the father to comply with the test. We acknowledge the father continued to have issues with testing after the permanency hearing, but he also continued to struggle with transportation.

---

[5] The most recent caseworker was assigned on July 24 and had only seen the family together once before the termination hearing.

We also note that there is no evidence the father parented these children while under the influence, and there is only speculation that the children were exposed to marijuana use. A DHS caseworker reported that she went to the home where the father was staying and could not contact the father but smelled the odor of marijuana. It is unclear whether the father or the children were home at the time. This DHS worker also reported that one of the children told her the father smoked "black stuff" that "smelled different" than cigarettes. It is unclear what the black stuff was or how it smelled. An FSRP worker reported she entered the home when she was dropping the children off and smelled marijuana. But she did not refuse to leave the children or report the father appeared to be under the influence.

Even with the admitted marijuana use by the father, there must be "clear and convincing evidence the children would be exposed to an appreciable risk of adjudicatory harm if returned to the parent's custody at the time of the termination hearing." *In re E.H.*, No. 17-0615, 2017 WL 2684420, at *1 (Iowa Ct. App. June 21, 2017). "[T]he mere fact of [drug] use does not establish adjudicatory harm." *In re M.S.*, 889 N.W.2d 675, 682 (Iowa Ct. App. 2016). The State must show a "nexus" between the parent's drug use and "appreciable risk of adjudicatory harm to the child." *Id.* No evidence established the father exposed the children to his use of marijuana or attended any visit under the influence of drugs. And while the father failed to follow through with the case plan to the letter, that failure alone does not establish the required nexus. *Id.* at 681. Because evidence of harm to the children based on the marijuana use alone is lacking, we focus on reunification where positive steps have been made.

We find the father had been working to address the issues here. This is a loving father who has appropriately cared for his children since DHS got involved. He had adequate housing and a steady job, and he participated in domestic-violence programming, completed a mental-health evaluation, and had no further incidents with the mother. The last piece of the puzzle was addressing his substance use. He participated in some drug testing, but his participation was inconsistent. Whether the inconsistent participation was his choice or because of his lack of access to resources and consistent DHS caseworker support is hard to tell. We believe six more months of services would allow the father to obtain a substance-abuse evaluation[6] and more consistently focus on drug testing. We are mindful that any delay in permanency will impact these children. But we must also give parents the tools to succeed before terminating their parental rights. *See In re M.M.*, No. 19-1293, 2019 WL 5791290, at *3 (Iowa Ct. App. Nov. 6, 2019) ("While time is of the essence in achieving permanency for children, we cannot lose sight of the competing principle that termination is an outcome of last resort." (altered for readability) (citation omitted)). But for the marijuana use, there appear to be no barriers to the father parenting these children appropriately. This family deserves a coordinated and consistent effort to reunite. We find the juvenile court should have granted the father a six-month extension rather than terminate his parental rights. We reverse the juvenile court's termination order and remand for further proceedings.

---

[6] Or obtain another substance-abuse evaluation if, as the reports indicated, he previously completed one.

**IV. Disposition.**

For the above-stated reasons, we reverse the termination of the father's parental rights and remand for vacation of the juvenile court termination order, implementation of a six-month extension, and further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**